**RACCOON DEVELOPMENT, INC.**

v.

**The UNITED STATES.**

**BROOKSIDE SALES, INC.**

v.

**The UNITED STATES.**

Nos. 45–64, 46–64.

United States Court of Claims.

March 15, 1968.

E. L. Carpenter, Columbus, Ohio, attorney of record, for plaintiffs, Jules E. Garel, Columbus, Ohio, of counsel.

Norman J. Hoffman, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner George Willi under the order of reference and Rule 57(a) with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 30, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On January 22, 1968, defendant filed a motion that the court adopt the opinion, findings and conclusion of the trial commissioner. Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiffs are not entitled to recover and the petitions are dismissed.

## OPINION OF COMMISSIONER

### WILLI, Commissioner:

These consolidated cases, presented on a fully stipulated record, raise but one issue—the taxable base to which the *ad valorem* documentary stamp levy imposed on real estate transfers by section 4361 of the Internal Revenue Code of 1954 is to be applied. The real estate involved consisted of lots improved by new prefabricated dwelling houses. The question is whether the documentary stamp tax properly attaches to the total price that the home buyer paid for the house and lot or only to the portion of that price attributable to the lot.

The facts, elaborated in the findings of fact accompanying this opinion, need only be summarized here.

The plaintiffs, referred to herein as "Raccoon" and "Brookside Sales," are Ohio corporations in the business of land development for residential purposes. They conducted their land operations in conjunction with three sister corporations; Brookside Builders, Inc. and Courtesy Homes, Inc., both engaged in building prefabricated homes, and Courtesy Homes Sales, Inc., exclusive sales agent for Brookside Builders and Courtesy Homes. Significantly, one individual, Mr. Byron E. Schofield, was the controlling shareholder and principal officer of all of these corporations throughout the period in suit.

Neither Raccoon nor Brookside Sales sold residential lots except in conjunction with the sale of a prefabricated house constructed by their affiliates.

Between November 1, 1958 and October 31, 1962, the period in issue as to both plaintiffs, Raccoon conveyed 128 lots to purchasers of prefabricated homes and Brookside Sales conveyed 683 lots to such purchasers.

Code section 4361 imposes a tax on all deeds of real estate where the value of the property involved exceeds $100. The prescribed tax rate is 55 cents for each $500 increment of value or fractional part thereof.

In calculating their documentary stamp tax liability on the conveyances mentioned above, plaintiffs applied the 55-cent rate only to what they regarded as the portion of the total price paid by the home buyer that was attributable to land. Tax deficiencies and interest were assessed by the Commissioner of Internal Revenue on the theory that tax was due on the full price paid by the home buyer for his house and lot. The deficiencies and interest were duly paid and timely claims for refund were filed. After formal disallowance of the claims the instant suit followed.

In presenting the cases here the parties have agreed that all real estate transactions underlying the taxes in dispute are typified and fairly illustrated by one involving the purchase of a home from Brookside Builders by Mr. and Mrs. Leo Colborn of Gahanna, Ohio, a suburb of Columbus.

At the root of the Colborn transaction was an October 1960 agreement between Brookside Sales and Brookside Builders, both headed and controlled by Byron Schofield, under which Sales, the land development company, bound itself to fully develop the lots comprising the Royal Manor Addition at Gahanna and gave Builders the exclusive right to purchase such fully developed lots at $3,250 each. Sales agreed to convey the lots to either Builders or its nominee, whichever directed by Builders.

Homes of the type purchased by the Colborns were advertised by Builders in the Gahanna newspaper. The theme of the advertising was clearly directed to the sale of a house and lot for a single total price. In fact, the parties have stipulated (1) that none of plaintiffs' lots were sold or offered for sale except in conjunction with the sale of a prefabricated house erected by plaintiffs' affiliate and (2) that all interested home buyers believed that they were making a single purchase consisting of a house and lot.

The following is a chronological summary of the Colborn transaction.

On October 23, 1960, the Colborns signed an agreement with Builders to purchase a Royal Manor home for a price not to exceed $14,600 plus closing costs.

On November 30, 1960, after completion of a satisfactory investigation of their credit, the Colborns signed a so-called Construction Agreement with Builders for the purchase of a specific Royal Manor lot and home to be built on it. The agreement recited a price of $11,900 for the house and $2,700 for the lot.

On the same date, Mr. Colborn, a Navy veteran, filed an application for VA financing totalling $14,600 for the purchase of "improved realty" with no price breakdown shown as between house and lot.

On January 5, 1961, the Veterans Administration issued a loan guarantee commitment covering a $14,600 loan to the Colborns repayable over 29 years with interest at 5¼ percent. On the strength of this commitment National Homes Acceptance Corporation notified the Colborns that it would make a loan in accordance with the terms of the VA guarantee.

On January 11, 1961, plaintiff Brookside Sales executed a warranty deed conveying the subject lot to the Colborns who executed an appropriate mortgage deed and note payable to National Homes Acceptance. These loan and title documents, all of which had been prepared by Builders' lawyer, were forwarded to the Lawyers Title Insurance Corporation for recording and issuance of title insurance. Builders instructed Lawyers Title to affix $2.75 in documentary tax stamps to the Colborns' deed. Under the rates prescribed by section 4361, $2.75 worth of stamps reflects a property value of $2,500. This assigned figure was the result of an agreement between plaintiffs and their corporate affiliates as to the value of Royal Manor lots. The discrepancy between this figure and the $3,250 and $2,700 figures specified in the October 1960 Land Purchase Agreement between Sales and Builders and the Colborns' November 1960 Construction Agreement, respectively, is unexplained.

On January 20, 1961, the Colborn loan and title instruments were recorded. The warranty deed was then mailed to Builders where it was kept on file pending completion and occupancy of the Colborn house which occurred on or about May 1, 1961. At that time, after the Colborns had executed a Veterans Administration Declaration of Acceptance, the warranty deed was delivered to them by Builders. The Colborns' first payment on the mortgage was due June 1, 1961, the closing date.

The parties have stipulated that if, after plaintiffs executed a warranty deed, the buyer decided not to go through with the proposed home purchase, he was obliged to execute a quitclaim deed

on the lot involved. Accordingly, it was impossible to acquire any of the plaintiffs' lots except in conjunction with the purchase of a completed prefabricated house erected and sold by their construction and sales affiliates.

In denying liability for the additional taxes asserted by the Government, plaintiffs' position rests on the formal implications of the documents and events attending the transactions in suit. Specifically, reliance is placed on the fact that the only thing deeded to the home purchaser by plaintiffs was an improved lot with no house on it at the time of recordation; which event, it is urged, fixes the incidence of the tax according to the applicable Treasury Regulation. The consideration paid for the house, plaintiffs say, should not create additional documentary stamp tax liability because the house was acquired in a transaction to which they were not a party.

Plaintiffs' argument is deficient in both fact and law.

Neither the Treasury Regulations nor any other authority make recordation of a deed the touchstone of taxability for documentary stamp purposes. To the extent that the timing of taxability hinges on an event, it is delivery, not recordation, that is controlling. Thus, section 47.4361–1(a) (2) of the Treasury Regulations provides: "The tax attaches at the time the deed or other instrument of conveyance is delivered, irrespective of the time when the sale is made."

■■ Under Ohio law recordation is at most presumptive of delivery, not determinative. Smith v. Ranck, Ohio Com. Pl., 80 N.E.2d 631, 37 Ohio Op. 235 (1946); Lemley v. Shafer, 14 Ohio App. 362 (Ct. of App., Lawrence Co., 1921). The critical factor is the intention of the parties at the time of execution and recordation. At that time did the grantor and grantee intend a present transfer of the property described in the conveyance? Kniebbe v. Wade, 161 Ohio St. 294, 297, 118 N.E.2d 833, 835 (1954).

■ The stipulated facts respecting quitclaim leave no doubt that in these cases a present transfer of property was not intended at the time of recordation.

To attempt to isolate and segregate the acquisition of the lot and the dwelling ignores the actualities of the total situation. This may not be done. Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

It is wholly unrealistic to overlook the fact that all corporations involved in the transactions in suit were effectively controlled by a single individual, Byron Schofield. In that capacity, he was necessarily responsible for the October 1960 Land Purchase Agreement under which the plaintiff corporations bound themselves to sell no lots in the Royal Manor Addition except as approved and directed by their home building and sales affiliates. For the same reason it must be assumed that he was responsible for the quitclaim provision that made it impossible for a third-party purchaser to acquire one of those lots except as a part of the purchase of a finished home erected and sold by Builders. These factors, without more, combine to impel the conclusion that under no circumstances could the taxable conveyance pertain only to land. Suffice to say, the various implementary loan and purchase documents, detailed in the accompanying findings of fact, are equally persuasive that interested buyers were offered homes, not lots.

■ It is not disputed that the documentary stamp tax due is measured by the net consideration paid for the realty conveyed where that consideration is definite in amount. In the Colborn transaction, agreed to be typical, that consideration was $14,600. They were neither offered nor did they bargain for anything other than a home, including a lot, at that price. Accordingly, the lot was in reality an inseparable part of what the Colborns bought. The lump-sum purchase price that they paid is

therefore the proper measure of documentary stamp tax liability.

Applying to the facts of these cases the settled maxim that the incidence of taxation depends upon the substance of a transaction,[1] the plaintiffs cannot prevail.

---

1.  Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945).